Network, Incorporated. Good morning. May it please the Court, Ryan Andrews on behalf of Plaintiff Appellant Alexander Yershov, I'd like to reserve two minutes for rebuttal. Good morning, and you may. Thank you. I'm seeking reversal, but I think Judge Saylor got this case mostly right. His opinion on what counts as personally identifiable information is exactly right. My friend's argument that only name and address together are PII can't be squared with the text or the purpose of this statute. I also think Judge Saylor and the 11th Circuit's opinion in LSV Cartoon Network set out the correct legal standard that some type of durable relationship is required to be a subscriber and therefore a consumer under the Video Privacy Protection Act. Where both courts drifted off course was failing to recognize that Mr. Yershov plausibly alleged that he has the requisite type of relationship with Gannett. And the result is one that completely guts the privacy protections that Congress tried to put in this law. There is no way Congress drafted this law to allow USA Today to publish Judge Bork or the presumptive next nominee's video viewing habits just because they were downloaded and collected through a free app and not a brick and mortar store. So how would you describe the relationship then? Between Mr. Yershov and Gannett? Yes. I think they have a durable relationship. And I think today and in 1988. What does that mean? Durable in what respect? So there are several definitions of the term subscriber. And the one that we focus most heavily on in our brief is that it's arranging for access to a service or an online service. You have to do something. You have to go out and do something. That's just another way of saying that there is a durable relationship. And that's what Mr. Yershov did here. He went to an online market. He selected the USA Today app from the two million other offerings. He downloaded its complex software onto his phone. And by downloading the app, he told Gannett where to deliver its content. In essence, he gave them his address. He placed basically the modern day equivalent of a newspaper holder at the end of his driveway right there on his phone. It made Yershov agree to terms and conditions when he used the app. Well, take your analogy. When you put the newspaper down there, you don't need to do anything then. Monday morning, they come and put it there. And if he signed up for the push notifications, then your analogy would be apt. But I understand it, even though you point out how the push allegations, the push notifications work, which seemed quite convincing as far as being a subscriber. As I read the complaint, is there an allegation that your client hit yes for the push notifications? There is not an allegation in the complaint that he opted for the push notifications. But I don't think that's really despotic. But then for his purposes, that means your analogy doesn't quite work. He only gets a newspaper delivered when he goes down and does something to his. He has to open the app. Not exactly, Your Honor. If he left the app open, the app would continually just send him information. It would give him periodic access to the information. And how is that alleged in the complaint? That is just an inference about how applications work. Could it have been more detailed? Yes, I think our complaint was fairly detailed about how all of this worked. But that was just an inference that I believe we should have gotten from the district court in this complaint the district court took. Slightly too simplistic view of that type of basically of how apps worked. He, Judge Saylor. And let me make sure, I understand the inference because you want us to draw that same inference, right? That's correct. So the inference you want us to draw is that when you allege he put this app on his phone, we then know that if he opens that app, while it's open, USA Today will send things to it. That's correct. And that would satisfy the particular periodic delivery aspect of several definitions. But the one that my friend urges the court to follow and to allow his app to basically disclose everything that people watch is that there was no registration. There was no giving of personal information. But by downloading the app, Yershov gave Gannett all the information that it needs. It gave him his Android ID, it gave his GPS, and it likely gave much more. By downloading the information in exchange to get information is a subscription. That happened here. It registers, but it doesn't register personally identifiable or identifying information. So it registers what it, what machine to deliver it to, but it doesn't register who the machine belongs to, and it's the individual who has the privacy interest to protect. That's true, and I have two answers to Your Honor's question. Okay. So first, it's that the newspaper industry specifically, of which this app is a part, considers downloading an app and using it one time per month to be the equivalent of registering. It's the equivalent of giving your name or your email address. And they call those people, in their words, a digital subscriber. That is at least as persuasive and as plausible an inference that this person is a subscriber as the definitions that Judge Saylor used, the podcasts and the YouTube. It's just that subscriber isn't used consistently. And to the extent that an Android ID only identifies a device, the language that Congress used here is very broad. The language it uses includes information that identifies persons, a person, and that accounts for something that identifies a device or a home or a car associated with that person. Judge Bork's account, the patient zero of this particular act, it wasn't his account. It was his wife's account, and it disclosed the movies that his family watched, showing the intent of Congress that an address is a type of shared identifier. When you sign up for this app, is there an option with regard to location services? I don't believe so. So it automatically then takes off your phone, your GPS coordinates when you're using it? That's correct. So it knows the phone identifying information, and it knows every time a video or anything is looked at where you are when you're looking at it? Exactly where you are, in a three meter wide area and a five meter tall area. If I had my phone in my pocket now, it would know I was standing here in front of this. It doesn't know it's you. It just doesn't know it's you standing there. It just knows that your phone is sitting there. I think Chief Justice Roberts puts this best when he's talking about cell phones in Riley v. California. Cell phones are such a pervasive part of daily life that a visitor from Mars who came down would rightly conclude that they're probably an important feature of human anatomy. The court goes on to then note that nearly every American has a cell phone within five feet of them at all times. It's not just identifying a device. It's identifying a very, very, very personal device. Well, didn't you at some point in your brief make reference to the possibility of going from the, of taking the Android number and in fact determining the actual name of the device? Well, the reason that they're collecting this information is that they're giving it to Adobe, who in addition to making Photoshop and other software, is a data analytics company. It's a data miner. When they give this Android ID number to Adobe, Adobe has collected that ID number along with a host of other information, name, address, email, Facebook accounts. When they get the number- It's the comprehensiveness of Adobe's files that would allow the specific identification of a name. That's correct. They get the number. They know the name. It's like giving a social security number to a credit reporting agency like Equifax or TransUnion. Yes, in isolation on the four corners of the document, a social security number appears to be a random anonymous number. But if you give it to TransUnion, you know that they know a whole host of information about you. Same thing if you give a telephone number to the company that creates the phone book. Upon receipt, they're aware that it's not just a series of numbers. They're aware that there's a person attached to that number. So when GANS gives it to Adobe, there's absolutely no doubt that it gives enough information to Adobe to put with its other information that would allow Adobe to identify someone personally probably. But the question is, does GANS it violate the law when it only gives information capable of allowing someone else to personally identify, as opposed to giving enough information in and of itself to be able to personally identify the person? Your Honor, the statute has a knowing requirement. And we allege that they knew that they were giving this information to GANET so they could do this, so that GANET could then sell hyper-targeted advertising through its application. Advertising to a particular person is considerably more valuable than advertising to someone with broad demographic information. And the concept of personally identifiable information that we're proposing has already been found by this particular court in Borean. In that case, this court interpreted personally identifiable information as information that could be potentially used to link, in that case, a DNA profile, basically a series of numbers, because it was a specimen number on the DNA profile with an actual person. And they concluded in that instance that that's personally identifiable information. That was this court's interpretation. That interpretation is consistent with the Seventh Circuit's case in Dahlstrom, where they interpreted personal information under the Driver's Privacy Protection Act to be information that aids in the identification of an individual. Things like birth date, height, that may by itself might not be so bad, but in combination can tell a lot about a particular person. My conception of personally identifiable information is also consistent with every single other privacy statute. The argument that my friend is pushing would make the BPPA essentially a sui generis statute, where things like unique device identifiers, social security numbers, phone numbers, everything but name and address are all out. And I think, importantly, that conception that we're pushing follows from the common law of defamation. Under defamation, information identifies a person when the recipient of that disclosure knows who it's referring to. This test has been faithfully applied in courts for over 100 years. And in the defamation context, you didn't need to give a name. It was sufficient to be defamation if, at the end, the recipient of the information knew who you were talking about. And here, when the recipient of that information unquestionably knew who they were talking about, and that should have been held, at least plausibly at this stage of the litigation, to be a violation of the act. Let me go back to the original circumstances of the Bork law, just to try to get a sense of the concept that they had in mind. Do you think it would have been a reasonable reading of the Bork law to say that someone who came in and availed himself of free borrowing privileges of whatever they were, not DVDs, but tapes, I guess, at the time, would have been deemed to be a subscriber for purposes of the Bork law? I do. Several definitions that were in place at the time, in 1988, when they passed this law, showed that subscription did not necessarily entail payment. The 11th Circuit's decision in LSV Cartoon Network specifically held that payment wasn't required. And I think the best example... Then why didn't Congress use the word user as opposed to subscriber? That would have been simple and clear. If I may answer Justice Souter's question? Yes. Because subscriber, I think, covered this particular instance. And if Your Honor looks at the legislative history, when they're talking about who's covered, they use the term user almost interchangeably with the term subscriber. Judge Bork, in fact, wasn't listed on the thing as the primary account holder. He was actually listed on the account at the video store as other user. So I think that shows the intent to cover people like that. There are no further questions. All right. Thank you. Thank you. Morning. May it please the Court. Mark Zwillinger for Gannett, which publishes the USA Today. May I ask you to start by responding to your brother's last point? Because his point seems to be that if we do not regard subscriber as the equivalent of user, then the Bork law would not have covered Judge Bork. I don't think that's right. I thought your question was right on when you said, why didn't Congress use the word user? Well, I thought it was a good question, too. What do you say to his response? The idea of a subscription in 1988 was where the person offering the content knew something about the subscriber. That is, Judge Bork's name was known to the video store. He wasn't an anonymous renter of videos. They didn't know Judge Bork as renter 412. They knew him because he had a subscriber relationship with the store. He gave his name to the store. And so they could disclose it. One of the ironic things about this case is we are accused of disclosing personally identifiable information about a subscriber, in their words, that we don't know who he is. So you're saying then that if they, what if they had just, suppose this video store delivered the videos to its customers or users. And so all they disclosed was the address to which they delivered the video each week. And they had a long list and it showed Judge Bork's home address and it showed his work address. They could release that and it would be no violation of the laws, I think what you're telling us. I think there's two parts to it. One is whether he's a subscriber. In that case, Judge Bork was a customer of the store. He had a relationship. He continued to rent videos. Well, let's say every day he got a video, just like every day someone gets U.S. News and World Report or U.S. News. Right. So he had that type of relationship. It's not the relationship that's established from an app or even from a push notification. He has to first have a subscriber notification. Well, no. He just every day got a free video delivered to his home. Right. But one of the points that I think is important to focus on is the VPPA was never meant to cover every way in which someone could view video content, especially news  I don't think you're answering. We'll get to that. But I don't think if the video store had simply delivered videos to him upon request and had been doing it for eight months, once a week Right. They could release his address as our user at the following address has viewed all the following videos on the following dates and you'd say that's no violation of the statute. I wouldn't say that. I would say it depends on whether the information they disclosed identified a person because that's what the definition is. But what I just said, that's all they did was they just listed that 27 videos went to 16 State Street and that's where he lives. Well, if that address was one international place, that wouldn't identify a person. There are 4,000 people who work at one international place so that wouldn't violate the statute. To violate the statute, you have to identify a person. Suppose it has a residential address. It's possible. It's possible. Then why isn't when we have a 12B6 motion on the complaint here and what we know is that they're disclosing where the video was viewed each and every day why isn't that the equivalent of disclosing someone's address? Because first of all, the person is not a subscriber. That's why I want to keep taking you back to that. That's assuming the answer that my brother is trying to dissect. He's a subscriber. If the divulgence of the home address 53 Green Street is an easy means to identify the person who lives there as being the person to whom the delivery is made. In the Bork case for example, if they had said the following videos get delivered to the Bork house on a regular basis, I would have supposed that would have identified Judge Bork. Here the argument is instead of using 53 Green Street, the information that is divulged is in fact a, what do you call it, I want to call it an Adobe number, that's the wrong. An Android ID. Plus the address. They actually disclose the physical address not just. In your hypothetical. If the GPS, as I understand it, the allegation is that Gannett gathers the GPS location of where the phone is at every moment that it's downloading a video. But there's no allegation that that information was used to identify anyone in the complaint. It was not used to identify. Am I correct that that is what, they're not just disclosing the Android ID number, they're disclosing the physical location on the planet. You could actually look at GPS satellite and see that house where the video is being viewed each day. That's what they're disclosing. I have to accept that as true for the purpose of the complaint, although I don't agree that it is. I don't agree that that information went. You may win on some re-judgment. Nor do I agree that it discloses the house. That is the GP, the information that they may be getting may be in a far wider radius. Well, actually on many occasions it would actually tell you which part of the house. The thing I keep fighting you on, Your Honor, and I apologize for doing it, is the statute has a two-part inquiry. Judge Saylor looked at this and the 11th Circuit looked at it the same way. First, are they covered by the statute? Do they have the relationship that allows them to be deemed a subscriber? Then, is the information that's disclosed about them personally identifiable? And in your example, Judge Bork would have had that relationship. He would have gotten a video every day. He would have given his name. Let's keep the two moving pieces one at a time. Do you agree with me? Or is there any reason why we would conclude that delivering the GPS location of where the user viewed the videos every single time they visit them is not conveying personally identifying information? I agree with you that it's not conveying personally. Why not? Because it does not identify a specific person as the statute requires. It identifies a location. So you would then say, back to, I thought we agreed that if the video store disclosed where they were delivering the videos every day to 16 Green Street or whatever, you would say that's not personally identifying information? No, on the home address, I said it could be. But why isn't the GPS location when it shows us the address where they're viewing it every day? I mean, if I'm looking at something and it shows U.S. News has been viewed 78 days in a row at 16 Green Street, I think I've got a pretty good basis for guessing that someone at 16 Green Street is watching that. You might with 16 Green Street, but you don't with this courtroom. All of us could be watching USA Today, looking at USA Today right now, and the information that this courtroom looked at it would not identify a single person. So on that location, you'd say that was not the transmission that went to Adobe that simply said one courthouse way. You would say that's not personally identifying information. But I'm asking about the transmission that went to Adobe that says 75 days in a row it was looked at at the GPS location that coordinates with 16 Green Street. Why isn't that personally identifying information? Because on its face to the person who's disclosing the information, they do not know how to identify a person based on that. It is a clue. It may be a very good clue, but these hypotheticals are so far from an Android ID that we have strayed incredibly deep. But we're not talking about the Android ID. We're talking about the GPS location that's disclosed. But there's no allegation in this case that GPS location was ever used by anybody to identify a single person. There's no allegation in the complaint that Adobe... Actually, there's an allegation that Adobe uses all the data that they're given to combine it with the data they already have so they can actually pull the name out of their database, or at least a high probability of the name. I think that's not correct. I don't think there's any allegation that Adobe used anything other than the Android ID to identify any of the subscribers. On that point, there is something I'd like to raise, which is there also is no allegation that they identified Mr. Yershov. In fact, these speculative allegations about what Adobe would do with the Android ID are contained in paragraphs 22 to 29 of the complaint. Word for word, these were dismissed as speculative and not supporting any conclusion that Adobe could do anything with the Android ID in the ESPN Eichenberger case. That is, there's no allegation here. I would focus you specifically on paragraph 28 and 29 where they quote an Adobe executive who says, we do cross-device matching to figure out if a user who viewed the content today is the same user who viewed it yesterday without knowing who they are. The very language in the complaint says Adobe has no idea who these people are. They are just trying to find matching. That is, if Justice Souter visits USA Today and looks at a story on his phone and the Android ID is registered, tomorrow that Android ID may be registered again as looking at another story. But they don't try to match it up with Justice Souter's identity. If you are right, when Justice X is nominated tomorrow, one of the journalists at U.S. News could go to their computer site and say, here's Justice X's home address. Have you got any data of a GPS location that's downloading any videos at that site? And I think what you're telling us is U.S. News could hand to its journalist and its journalist could publish the next day a list of videos viewed over the last year at 16 Green Street, which is the Justice's location. If we were to sustain this decision, what I just said, the law would not prohibit. If you go to the USA Today website Would it prohibit what I just said if we were to sustain this ruling? The law would prohibit what you said if you sustained this ruling. And why is that? Because we don't have any information that would When a subscriber goes to the internet and goes to usatoday.com, which Mr. Andrews conceded You haven't said why what I just said would be prohibited by the law if we were to affirm this decision. So if you were to affirm this decision, casual viewers of web content, people who go to the internet and view videos on usatoday.com are not covered by the VPPA. They're not covered. So now you're saying that what I just said would not be prohibited by the statute. If they were a casual viewer. How about Mr. Yersoff? Suppose Mr. Yersoff were nominated for a position in the government tomorrow. Correct. Okay. And one of your reporters went to your data set and said, here's Mr. Yersoff's home address. Got anything? But we don't have his home address. We have an Android ID. I would submit Here's his GPS location of his house. Got anything that corresponds to that? And if we sustain this ruling, as I understand it, your data people could turn over to your journalists all the videos that were seen at that GPS location, which is Mr. Yersoff's house. The Android ID, which is what we turned over, not an address. The Android ID does not reveal any information about the person. We could publish the Android ID on the front page of the newspaper tomorrow, along with all the videos. I wasn't asking about the Android ID, was I? But that's what we said. GPS location. If your position is correct, U.S. News could publish the next day here are all the videos that were viewed in the last year at the GPS location that corresponds to Mr. Yersoff's house. Without saying that it corresponds to Mr. Yersoff's house. That's correct. No, they could say it corresponds to the following GPS location. And we looked up in the phone book and that location is owned by Mr. Yersoff. We don't have GPS location that is that type of information. We simply don't. Can I go back to a point you raised earlier? The user controls whether the GPS location is collected or not. It is an Android device But now you're off. For the complaint, we've got to assume that the GPS location, there's no allegation that the user controls that in the complaint. There's no allegation about most of what Mr. Andrews represented to the court. In any event, the there isn't an out in the statute for whether Justice Bork writes down his address at the video store either. I think you're really saying that U.S. News could announce to the world that here are all the videos viewed at the following GPS location which corresponds to 15 Green Street. I think that's what you're telling us. And Congress would need to change the statute if it wants to address that situation. Setting aside the fact that I don't think the complaint really focuses on the use of GPS, yes. I think that we could disclose of non-subscribers of casual viewers of web content, the information about the geolocation of where the video was viewed from. Okay, and what you just said is you're hinging out your hat on the subscriber issue, not the personal identifying information. I have always been hinging my hat on the subscriber issue. But isn't it relevant for us in determining the breadth of the concept of subscriber to know what could be done with this kind of information in relation to the object of the Bork Law? And it seems to me that one way to look at your argument is to say, given our concept of subscriber enormous amounts of personal information can be disclosed for exactly the same purpose and with exactly the same effect as the information disclosed in the original Bork scenario which it was the object of the statute to stop. I know the two questions are distinct, but doesn't the answer to the personal information question have a bearing on how broad or how narrowly we should construe the subscriber question? I don't think it should, which takes me back to the point where I started. You can go to the movies and the movie theater can disclose every movie you've seen because it's not covered by the VPPA. You can watch TV and the TV can disclose every show you've watched because it's not covered by the VPPA. You can go to YouTube and watch two million cat videos on YouTube and YouTube can disclose the GPS location or the IP address because it's not covered by the VPPA. The VPPA is not a federal internet privacy statute passed in 1988 to cover all method of consuming content. It was passed for a narrow purpose. It used the word purchaser, renter, or subscriber. He concedes that if you do this, all of what we're talking about on the internet the VPPA does not apply if you sit at your computer and use your browser. His entire argument hinges on the fact that when you download an app an application, a piece of software to your phone so you can more type and push buttons rather than type in addresses, that it changes it and the VPPA is covered. If there's one thought I'd leave the court with, it's Congress had a chance in 2013 when there were millions of videos on the internet. When there were hundreds of thousands of apps to say, no, we meant the VPPA to cover every way somebody could consume content and Congress didn't do that. Congress left the definitions exactly the way they were in 1988 because the VPPA is not designed to stop internet browsing and say as soon as you go to a website and view a video, the information, the IP address of your computer, that must be cared for as if it's the most sensitive information possible. It's not a statute to break the internet that was passed in 1988. It was passed for a single purpose. When you have a relationship with a video store or an online service like Hulu or Netflix and you rent videos, that site can't turn over your name and the videos that you watch. But if you interpret it the opposite way, in a sense you break the internet because every website has video content and every website captures IP addresses and discloses IP addresses to third parties. And so the VPPA can't be made to be the privacy statute that covers the internet. Congress can pass one. It chose not to amend it in 2013 and it can pass one now, but this is not that  things the VPPA was meant to cover. And I would just assert finally that you don't distinguish between cat videos that you watch on YouTube and things you download in an app. The USA Today is a newspaper and we have some video clips. We're not designed to be what the VPPA was designed to cover and those push notifications give you news alerts. They're not subscriptions to video services. So I know that you're very concerned with the ramifications of the argument, but this statute is not the vehicle to convert into a federal internet privacy regulation. I'd like to make two very quick points on reply. The first is which my friend says the complaint is speculative and he doesn't say we don't allege that they actually did anything with GPS or actually made an identity. So I'm going to read you paragraph 42 of the complaint that's on appendix 20. And it says, each time Yershov viewed a video clip using USA Today's app, USA Today disclosed his PII in the form of the title of the videos he watched, his unique Android ID, and his GPS coordinates to a third party datalytics company, Adobe. Using this information, everything I just said, Adobe was able to identify Mr. Yershov and attribute his video viewing to an individualized profile that they had in its databases. And if Gannett wants to disclose these things, this is a consent statute. Gannett can ask. This is a statute designed to give people, not companies, control over their personal information and what videos they watch. And if Gannett wants to disclose it, all they need to do is ask. It's a simple fix. It's not going to break the Internet, unless there are any other questions. Thank you.